OPINION
Johnny K. Deans, defendant-appellant, appeals an October 28, 1998 judgment of the Franklin County Court of Common Pleas finding him guilty of assault, a violation of R.C. 2903.13, a first-degree misdemeanor.
On October 22, 1997, appellant was bowling in a league at Grove City Lanes in Grove City, Ohio. Appellant's team and William Gollihue's team were bowling on adjoining lanes, and Gollihue had bowled seven consecutive strikes. Appellant put a "hex" on Gollihue, after which Gollihue missed getting a strike in the eighth frame. A verbal argument ensued between appellant and Gollihue, with Gollihue eventually stepping over the ball return between the lanes and approaching appellant. A brief physical struggle ensued during which appellant pushed Gollihue several feet. At that time, Rick Snyder approached appellant and another physical confrontation ensued, during which appellant punched Snyder at least twice.
Appellant was charged with one count of felonious assault for striking Snyder in violation of R.C. 2903.11, a second-degree felony. On October 5, 1998, a jury found appellant guilty of the lesser included offense of assault in violation of R.C. 2903.13, a first-degree misdemeanor. Appellant was sentenced to six months in jail, which was suspended. He was placed on probation for a five-year period, the terms of which included a $500 fine, two hundred hours of community service, and completion of anger-management counseling. Appellant appeals this judgment, asserting the following two assignments of error:
Assignment of Error No. 1
 THE FINDING OF GUILTY BY THE JURY OF THE LESSER INCLUDED OFFENSE OF ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE EVIDENCE DEMONSTRATES THAT THE DEFENDANT IN FACT ACTED IN SELF DEFENSE WITH REGARD TO THE ALLEGED VICTIM, SNYDER.
 Assignment of Error No. 2
 THE ACTION OF THE TRIAL COURT REFUSING TO ALLOW THE DEFENDANT TO UTILIZE STATEMENTS BY A STATE WITNESS INITIALLY GIVEN TO THE POLICE THAT THE DEFENDANT HAD BEEN GRABBED FROM THE REAR BY THE ALLEGED VICTIM DENIED THE DEFENDANT OF A FAIR TRIAL.
We will first address appellant's second assignment of error. Appellant argues in his second assignment of error that the trial court denied him a fair trial by refusing to allow him to utilize statements by a state witness, Steven Hartung, given to the police indicating that Snyder had grabbed appellant from behind. After the state completed its direct examination of Hartung, counsel for appellant requested any Crim.R. 16 material. The state produced two documents containing statements handwritten by Detective Eberhart indicating that Hartung stated that Snyder grabbed appellant from behind and spun him around. Appellant's counsel asserted that the statements contained in the documents were inconsistent with the testimony of Hartung, and, therefore, he should be permitted to use the documents to cross-examine Hartung pursuant to Crim.R. 16(B) (1) (g). The trial court found that appellant could not use the statement provided to Detective Eberhart to cross-examine Hartung because the documents did not constitute a "statement" as contemplated by Crim.R. 16(B) (1) (g). Appellant now argues that the trial court should have allowed him to use the statement to either impeach or attempt to refresh the witness's recollection as to what he may have told the police. However, appellant fails to point out any specific error in the trial court's reasoning on this issue or any particular case law or rule of law to support his assignment of error.
Crim.R. 16(B) (1) (g) provides:
 In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
 If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.
 If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
 Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal.
(Emphasis sic.)
A trial court's determination pursuant to Crim.R. 16(B) (1) (g) is reviewed under the abuse of discretion standard.State v. Clay (1972), 29 Ohio App.2d 206, 212. An abuse of discretion is more than an error of law or judgment, it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. State v. Keenan (1998), 81 Ohio St.3d 133, 137. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. State ex rel. Duncan v. Chippewa Twp. Trustees
(1995), 73 Ohio St.3d 728.
To be considered a "statement" of a witness within the meaning of Crim.R. 16(B) (1) (g) it must be shown that either the witness " `prepared, signed or adopted the statement, [or] that it minimally is a continuous, narrative statement made by the witness and recorded verbatim, or nearly so.' " State v. Cummings (1985),23 Ohio App.3d 40, 43, quoting State v. Johnson (1978), 62 Ohio App.2d 31,37. The "statement" at issue was taken down by Detective Eberhart in his own words in the form of investigative notes. "Notes made by a police officer during an interview with a witness to a crime are not subject to an in camera inspection within the intent and meaning of Crim. R. 16(B) (1) (g)." State v.Washington (1978), 56 Ohio App.2d 129, paragraph two of the syllabus. Further, there is no indication in this case that Hartung prepared, signed or adopted the statement as written by Detective Eberhart. Thus, Crim.R. 16(B) (1) (g) does not apply to the documents in question. Therefore, because the document made by Detective Eberhart was not a "statement" made by Hartung, the trial court was not required to make those summaries available to defense counsel for use in cross-examination and impeachment of Hartung. See State v. Allen (1990), 69 Ohio App.3d 366, 372;State v. Caldwell (Dec. 4, 1991), Summit App. No. 14720, unreported.
We also note that although appellant argues that he should have been permitted to use the documents to refresh the recollection of Hartung, appellant neither sought to refresh the memory of Hartung using the documents nor raised this specific issue before the trial court. The transcript reveals a discussion only as to whether the statement should be available to him for his use during cross-examination because of inconsistencies pursuant to Crim.R. 16(B) (1) (g). Nevertheless, we find that appellant could not have used the statement to refresh Hartung's recollection using the document executed by Detective Eberhart. Evid.R. 612 allows for the use of a prior writing to refresh a witness's recollection; however, it is clearly limited by Crim.R. 16(B) (1) (g). Crim.R. 16(B) (1) (g) specifically states the circumstances under which a statement must be given to a defense attorney for use in cross-examination of the witness, which we have already found do not apply. There is no allowance made in Crim.R. 16(B) (1) (g) for the use of the statement as a means to refresh a witness's recollection. State v. Ecklin (June 9, 1995), Lake App. No. 94-L-077, unreported.
Appellant also made what was essentially an oral motionin limine to preclude the state from cross-examining Detective Eberhart on any matters other than the one specific statement made by Hartung regarding whether Snyder approached appellant from behind. The trial court ruled that if appellant called Detective Eberhart as a witness, appellant's questioning would be allowed as if on cross-examination, but the state's questioning would not be limited to only those matters raised by appellant.
Evid.R. 611(B) provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Further, it is within the trial court's discretion to control the scope of cross-examination. State v. Woodard
(1993), 68 Ohio St.3d 70, 78; Berlinger v. Mt. Sinai Medical Ctr.
(1990), 68 Ohio App.3d 830, 838 ("Absent a clear and prejudicial abuse of discretion, [an appellate court] will not reverse a ruling by a trial court on the scope of cross-examination."). An appellant has the burden to show a patent abuse of discretion regarding a trial court's decision on the scope of cross-examination. State v. Walker (1978), 55 Ohio St.2d 208,214. Appellant has presented no compelling legal reason as to why the state's examination should have been limited. Appellant's counsel also expressed concern that the state would seek hearsay statements; however, the trial court specifically stated it would not allow hearsay absent a hearsay exception. After reviewing the transcript, we find that the trial court did not abuse its discretion in refusing to limit the state's examination of Detective Eberhart. Therefore, appellant's second assignment of error is overruled.
Appellant argues in his first assignment of error that the jury's decision was against the manifest weight of the evidence because the evidence demonstrated that appellant acted in self-defense. Weight of the evidence concerns the inclination of the greater amount of credible evidence to support one side of the issue rather than the other. State v. Thompkins (1997), 78 Ohio St.3d 380,387. Reviewing the entire record, the court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, at 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
Appellant does not dispute whether the state established, beyond a reasonable doubt, that he committed the offense of assault. Rather, appellant argues that the fact finder committed a manifest miscarriage of justice by failing to conclude that he established by a preponderance of the evidence that he acted in self-defense. To establish self-defense, a defendant bears the burden of proving by a preponderance of the evidence that:
 * * * (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. * * *
State v. Thomas (1997), 77 Ohio St.3d 323, 326. Furthermore, the amount of force used in self-defense must be reasonable. As the court stated in State v. Fox (1987), 36 Ohio App.3d 78, 79, "[o]ne may use such force as the circumstances require in order to defend against danger which one has good reason to apprehend." We note that whether the defendant used unreasonable force in repelling a perceived danger is a question of fact for the trier of fact.State v. Bruckner (Sept. 30, 1993), Cuyahoga App. No. 63296, unreported; State v. Howard (May 26, 1992), Montgomery App. No. 12533, unreported.
There are conflicting versions of the altercation between appellant and Snyder. Snyder testified that he approached appellant after the incident between appellant and Gollihue, mumbled "stay calm" or something to that effect, and put his hands out in front of him as he approached appellant. As he turned around to see where Gollihue was, he made contact with appellant's chest. He felt appellant resisting him, so he turned around and faced appellant. Appellant put his hands on Snyder's shoulders and tried to force him down to the ground, ripping his shirt. He slipped and fell, but did not grab onto appellant at any time. The next thing Snyder remembered was being helped off the floor and then seeing a puddle of blood on the floor. Snyder testified that at no time did he grab appellant from behind.
Mike Pfister, Snyder's bowling teammate, testified that after the confrontation between appellant and Gollihue, Snyder approached appellant with his hands up, "sort of like calm down type of thing," but he did not know whether Snyder made any contact with appellant. He did not see Snyder give appellant a bear hug from behind. Appellant then hit Snyder, and Snyder went down to his knees. As Snyder was lying on his back, appellant got on top of him and repeatedly hit Snyder in the face. He hit him "a few" times, but Pfister did not see appellant kick Snyder. Appellant's teammates then pulled him off of Snyder. Pfister never saw Snyder punch appellant or rip his sweater off.
Antonio Troiano, Snyder's teammate, testified that Snyder approached appellant, placed his hands on the front of appellant's shoulder, and grabbed him to push him back. Snyder was the first to make any contact. They were face-to-face, and appellant tried to break free of Snyder's grip on his sweater. At that point, Troiano grabbed his son to stop him from approaching the area, and when he looked back, Snyder was on his knees. Appellant then punched him about three times and kicked him in the face. He testified that at no time did Snyder punch appellant or fight back.
Steven Hartung, an officer in the bowling league, testified that he witnessed Snyder approaching appellant with his arms outstretched, but he could not see which direction appellant was facing. When questioned on cross-examination as to whether he made a statement to the police that Snyder grabbed appellant from behind and spun him around, Hartung stated that he could not remember making the statement but did not deny having made the statement. He then stated that the statement may have been accurate. After seeing that Gollihue was not interested in fighting anymore, Hartung turned around and saw appellant on top of Snyder. He saw appellant punch Snyder in the face but did not see him kick him.
Charles Temple, who was present at the bowling alley on the night in question, testified that he saw Snyder approach appellant "trying to get around to his back" to get "a bear hug" on him. Appellant hit Snyder close to the groin area with his knee and then took Snyder's shirt and pulled him down. Appellant hit Snyder once on the cheekbone as he was falling, but Temple did not know how many more punches were thrown. He stated that it appeared to him that Snyder was trying to stop the fight.
Gollihue testified that by the time he got up after the confrontation with appellant, he was held back, and he saw another man pulling appellant off of another guy and holding appellant back. He never saw appellant coming at him after he threw him. He did not see the confrontation between Snyder and appellant.
Paul Willette, D.O., testified that he treated Snyder when he came to the emergency room at Doctors Hospital. Dr. Willette testified that appellant had significant facial trauma, soft tissue swelling, a nasal fracture, and blood in his sinuses. He testified that the trauma to Snyder's face was consistent with somebody who had been punched and kicked in the face. He further testified that to a reasonable degree of medical certainty, Snyder's injuries were inconsistent with someone who had sustained only a single punch or kick because the injuries were in multiple areas of the face.
Douglas Stonerock, an officer with the Grove City Police Department, testified that when he arrived at the bowling alley he spoke to numerous individuals and observed Snyder bleeding around the mouth and his nose was red and swollen. Appellant had no physical marks on him, and his clothes were not torn. Officer Stonerock spoke with appellant, who told him that Snyder grabbed him from behind, he did not know who it was, and he turned around and hit Snyder. Appellant told Officer Stonerock that Snyder fell over the ball return and the fight ended.
Travis Schultz, who was bowling on the night in question and is the grandson of Charles Temple, testified that he saw Snyder run across the alley and grab appellant's collar from behind to throw him, which ripped appellant's sweater. He was not certain whether Snyder was trying to break the fight up but stated that Snyder grabbed appellant for no reason. Appellant then turned around and punched Snyder two times. Snyder then fell to the ground. After Snyder hit the ground, appellant did not do anything further to Snyder, and nobody had to pull appellant off of Snyder.
Randy Puckett, the vice president of the bowling league and appellant's teammate, testified that after the confrontation between appellant and Gollihue, Snyder ran and grabbed appellant on the shoulder or neck from behind. Snyder spun appellant around, they separated, and then Snyder came back from the front and got appellant in a headlock. He lost sight of the altercation for a moment as people stood up in front of him, and the next thing he saw was Snyder lying on the ground with blood on his face. He did not see either of them throw any punches. He testified that appellant had done nothing to Snyder before Snyder grabbed him.
David Ogan, who was appellant's teammate and co-worker, testified that Snyder ran at appellant and grabbed appellant around the throat from behind. The two wrestled with each other and fell over the ball return, Snyder hitting his face on the floor and appellant landing on top of him. Appellant jumped up and walked away holding his throat. Snyder then got up and again grabbed appellant from behind. Ogan testified that Snyder had his fist drawn, and somehow appellant got Snyder in front of him. Appellant then punched Snyder twice, after which Snyder fell to his knees. After Snyder fell to the ground, appellant then walked away. Ogan stated that appellant was trying to protect himself.
Appellant, who is thirty-two years old and a correctional officer, testified that he had been in a car accident in July 1997 where he suffered a concussion and had staples put in his skull. At the time of the incident in question in October 1997, he was still under treatment and having symptoms from his head injuries that he suffered in the accident. Appellant testified that after he shoved Gollihue away from him and walked to get his ball off the floor, he was grabbed around the throat from behind by Snyder. Appellant stated, "I was dangling, my feet was [sic] up in the air. Whoever it was picked me straight up in the air. I remember I couldn't breathe and almost blacked out for a second." Appellant and Snyder struggled for a moment and then fell over the ball return. After they landed, appellant saw "blood go everywhere." Appellant jumped up and walked away to get help from his friends, and Snyder again grabbed him around the neck from behind. Appellant struggled to turn around and then punched Snyder twice. After Snyder fell to his knees, appellant did not hit him anymore. Appellant stated that at the time, he was afraid because he could not breathe and because he still had head injuries from the previous automobile accident. Appellant had seen Snyder at the bowling alley before and stated that he thought Snyder was obsessed with "big-time" wrestling.
Appellant did not contest at trial, nor in this appeal, that he punched Snyder twice. Therefore, the only real issue is whether he did so in self-defense. As is readily apparent from the above recitation of the conflicting evidence presented at trial, the jury had to decide which witnesses were more credible. The trier of fact was free to either believe or discredit appellant's and his witnesses' assertion that he punched Snyder in order to prevent harm to himself and that the force used was necessary. The jury apparently chose to disbelieve the testimony of appellant and his witnesses. There was considerable evidence presented by the state to support the jury's finding that appellant did not act in self-defense. There were several witnesses that testified that Snyder was attempting to break up the fight between appellant and Gollihue and that Snyder approached appellant from the front with his arms outstretched. The state presented evidence that appellant was the first person to act in an aggressive manner by pulling Snyder down by his shirt onto the ground, ripping his shirt. There was also testimony that appellant continued to punch and/or kick Snyder after he had already fallen to the ground. Further, several witnesses testified that appellant got on top of Snyder when he was on the ground and that he had to be pulled off of Snyder. The jury also heard evidence that at no time did Snyder throw any punches at appellant or fight back in any manner.
The credibility of witnesses is a question for the trier of fact, who is better situated to observe the witnesses' demeanor, gestures, and voice inflections. See State v. Hill
(1996), 75 Ohio St.3d 195; Myers v. Garson (1993), 66 Ohio St.3d 610. After a thorough review of the record, we are not convinced that the trial court's decision to disbelieve appellant's argument of self-defense was a manifest miscarriage of justice. We therefore overrule appellant's first assignment of error because we find that the verdict is supported by the manifest weight of the evidence.
Accordingly, appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
LAZARUS, P.J., and BOWMAN, JJ., concur.